OK, the next case call for argument is Gargan versus Shafer Remodeling Company. Counsel.  I'm going to start by saying that I'm going to be representing Robert Shaffer, the defendant, Counsel Plaintiff, in the underlying action. We're asking the court to overturn the trial court's decision awarding damages to Plaintiff Gene Gargak and award my client, Robert Shaffer, his breach of contract action in the underlying action. There's a number of reasons we ask the court to do this. Number one, we believe, Your Honors, that there was no evidence that the building, this pole barn that we're talking about, was in there. This is a pole barn. We see these along the highways in Illinois all the time. There are farm buildings. There's different types of pole barns. This pole barn was the lowest level of a pole barn. Mr. Chanez, I've got to ask this question. Why didn't you third-party in this company? Travel Span? Yeah. Why didn't you third-party him? It's a great question, Justice Bates.      I mean, I don't know. I don't know. I don't know. I don't know. We believe that that's the role that the plaintiff should have done. Their contract was Travel Span. That was their contract. But your client indicated, I think, that he knew the roof was not manufactured correctly because he's put up these same manufacturer's buildings before. And he knew when he looked at it that it had been milled incorrectly, and yet he put it up anyway. Do you think he should get contract damages when he knows something is manufactured incorrectly and still puts it up? I believe he can in this case because it's a separate contract the plaintiff has with Travel Span. That was all done before my client got involved. But your client knew. Does knowledge have any impact on this? It does have some impact, but he did inform Mr. Gargak that there were problems with the materials. Is that disputed in the record? Not really because the text messages are clear. The written evidence was that my client did tell the plaintiff there was problems with the materials. Before he put it up? Not before, but as he was putting it up, Your Honor. So it hadn't been completed? Right, it hadn't been completed, yes. And the record will have text messages in that? Yes. There's a text message on the 4th of April, I believe it is, Your Honor, indicating there's an issue with the materials. They're not overlapping. That was the problem with the materials. My client is unsophisticated, Your Honor. He's built over 200 to 300 of these barns. He's a solo. He does this quite often. He's never been involved in litigation. I think the court relied on his testimony primarily to decide the way to get into the underlying case. I think the underlying case, I think my client was a bit overwhelmed by Mr. Gargak. I think Mr. Gargak was a squeaky wheel. He was a difficult customer to deal with from the very beginning. There was issues with the rock, the level of the rock from the very beginning of this project, which incurred a lot more expenses than were incurred. But what Mr. Gargak is getting here and getting to the damages, Mr. Gargak is getting a $40,000 building for $25,000. The court is basically allowing Mr. Gargak to get a better building by allowing this measure of damages to be awarded to him, a $40,000 residential whole barn building for $25,000. I think my client paid for that. And, Judge, just in case, to get back to your question regarding the materials, yes, we understand there's an issue with the materials. But that, to me, is an issue between the plaintiff, Gargak, and Stratospan. He did bring back some other materials to Stratospan earlier. There was a wall issue that Gargak had with Stratospan. Those were returned to Stratospan himself. He was aware of that. He could have done the same thing here. They could have brought in Stratospan in this case as well. My analogy, I would admit, probably is the best analogy about a refrigerator. But maybe the better analogy is a roof. You buy a roof for your home. Oftentimes, when you deal with roofs, you've got materials versus labor. There are different people involved. You buy the roofing materials. You've got a leak in your roof. The material manufacturer says it's the labor. The labor guy says it's the materials. In this case, what you're having is done as a separate cause of action for the materials that the plaintiff has for the bad materials. That's why you bring in the material manufacturer. Well, what could the plaintiff have done? Tell me more about this damages issue. Tell me what evidence there is in the record that says how much more he had to spend to get a non-leaky roof than a leaky roof. Well, he spent an additional $10,000. The evidence was that Mr. Vernon charged him, what, $9,800 or something like that. My question is, break that down for me. Was there any evidence in the record? Because you argued that there were additional purlins. What is that? Those are the wood pieces between the rafters, that whole piece together. So he got additional of those, which he didn't have in the original. So how did it break down out of that $9,800? Was there any breakout on that in the trial? I wish we knew. Mr. Vernon couldn't even testify to what his labor was versus materials at trial. I asked him that in the process of examination. He did sort of say it was half and half, but wasn't really sure. He didn't know. He did his estimate, and his estimate couldn't break down material versus labor. That's the plaintiff's burden. He couldn't even do that, Your Honor. So the fact that the plaintiff's own damage estimate, their own, his friend, his co-worker who did the work here, couldn't break down. What Vernon did was add a better building. He put on a residential building with additional purlins and additional nails and screws to make it a better building, more than $15,000 better building than Mr. Gardner originally purchased from Stratospan. So what he's getting here is a better building at my client's expense. I think you've got to at least measure these damages and bring them down. I mean, it's up to the plaintiff on how you do that. But if you're going to mark his damages as half labor versus half materials, although it's unclear from the evidence presented at the trial, it's up to the plaintiff to present that. And they've been doing a very good job with that aspect of this case. I don't know that Vernon really did a good job at anything in this case. He didn't say it was really even effective. Did your client get paid for the concrete work and the extra foundation? Some. He's owed another $5,000. He's been paid about $10,000. He's owed another $5,000. I know. But in the briefs, everything was, like, totaled. It wasn't broken out, like, how much was paid for the manufacturing. It's in the brief. Your counterclaim was for $5,227.34. I'm just wondering, out of that, how much was related to the roof? None of it was for the roof, Judge. It was only for the concrete. That $5,227.34 that you counterclaimed was only for concrete? Concrete and the rental of the Bobcat to do the grading work. There's additional rock, additional grade, and additional concrete. Okay. So you didn't charge it. You got fully paid for your workmanlike on the building? The $1,500, yes. I believe we did. Was there any discovery in this case? I know that it probably didn't warrant a whole lot, but no document discovery? Just the exhibits we presented at trial. At trial. So you walk in, and that's when you find out what the proof is. No depositions. That's how it works. No, Your Honor, what I would say is that with this evidence that was presented at trial, it was a bit of a see-in-the-pants type of trial. It didn't—we think it's important, obviously. Maybe not as important as the last case to the State of Illinois, but it's important to my client. Well, I didn't mean in any way to impugn it, but I just understand that there's always a cost-benefit analysis. I wasn't referring to that. Smaller cases that you have to decide whether or not it warrants discovering. I just don't think, Justice Case, that their damages even get to the point of establishing Mark Vernon's expertise. He's a friend of the plaintiff. He's a co-worker of the plaintiff. The evidence was he's got 30 years of construction experience. Nothing about experience building pole bars. You could get an expert—you could get a lawyer who's an expert with 25 years of litigation experience, but he'd never handled a family law case. You wouldn't hire him as an expert in a family law case. Did you object and say that he didn't have a foundation? A couple of times. A couple of times at trial. But the—as I recall the briefs, he built 12 homes from the ground up. I mean, this isn't really a case about experts. It's about your client knew there was a leaky roof. He put on a leaky roof. One of the arguments you made, which I found kind of interesting, was that people expect pole barns to leak. They do. I have trouble with that, I've got to tell you. Just based on my normal experience in life, I don't think people buy leaky roofs. I just— Well, Judge, this is a tin roof. I grew up on a farm, and all the pole barns on my farm leaked as a kid. We, in fact, used to run around in puddles in the pole barn as a kid. Yeah, I know, but you don't—do you really buy leaky roofs? Well, no, you don't buy leaky roofs, but you buy the cheapest roof out there. Like Mr. Gordak did. You're going to need a leaky roof. There was testimony not from Mr. Schaefer, but from Mr. Matsko, who has two of these buildings, who was involved in this project, that there's moisture, there's condensation, there's school holes. You're going to have leaky roofs in these kind of cheap buildings. He bought the cheapest building available. So he should have expected a leaky roof. Well, he didn't tell Mr. Schaefer. There's no evidence of trial. There's no evidence in the facts in these briefs that he told Mr. Schaefer he wanted this as a dry building. That's an important fact here. It's all about the intended use. He never told Mr. Schaefer. No testimony at trial, no testimony in the facts in our briefs, including Plaintiff's briefs, that he told Mr. Schaefer he wanted a dry building. Well, what you're saying is he should have expected a leaky roof. I'm not saying that. Farmers buy these to put hay in. They're not expecting them to have puddles of water, which was described, I think. There was testimony at trial that these buildings, this is an agricultural building. That was a testimony trial. That was the materials that he purchased for $14,000 from Stratospan. That goes to the facts. The testimony unrebutted at trial was that these are agricultural buildings. He got a residential one later from Mr. Vernon. Better materials, more purlins, better screws, better nails. But what he bought was an agricultural building, and those leak. Now, he never told Mr. Schaefer. There's absolutely no evidence at trial. And I caution counsels to tell you, if there's any evidence at trial, that Gargak told Schaefer, I want this to store more cycles into finished labor. There's no evidence of that. Isn't that really irrelevant? I mean, whether or not he told them this or that, the point is that Mr. Gargak bought a specific building, whether it was a $100,000 building or a $20,000 building. He bought the building. Your guy knew that the roofing material was defective, right? And he put up the building. Now, he might have put the building up in a workmanlike manner. I believe he did. And from what I'm hearing, your counterclaim goes to concrete, not to anything else. Well, I'll get to the last part of that first. But the concrete was an additional add-on. I just mentioned the contract. Signed off by Gargak. It's signed off. So the concrete is additional. It's added on. What he got was what he intended. When he purchased an agricultural building, he gets what he intended. It's just not a $100,000 building. Did he get the benefit of his bargain? The benefit of your bargain is to get what you pay for, and it's not an improperly milled roof. But he bought that building from Stratospan, and the contract that Schaefer had with my client says, build to Stratospan specifications. That's how this building was built. Okay. I guess my point is that we're missing somebody here, right? Stratospan. And so I just don't know how you get the benefit of your bargain if you buy a leaky roof. Well, he bought the leaky roof from Stratospan. I mean, there are like 32 holes. He bought the leaky roof from Stratospan. Right. Which is why I'm wondering why the empty chair is sitting out there. Well, that's as much on plaintiff as it is the defendant, Your Honor, and I think that's a question for them as well. I'll ask. Okay. Thank you. But what I would say is my client did perform a contract. That's all he's required to do by law. He tried to fix the building three times and was kicked off the job. He would have kept trying. He's never been involved in litigation. This is unique for him. He's done almost 300 of these buildings. He's still been trying to fix the building if he could. He was kicked off the job by Gargak. He tried to fix the building as best he could. He told Gargak about the problems. In regard to Vernon, though, and the damages, I think that's important. I don't know what Judge Barberis looked at as far as not awarding my client his damages. There's little or nothing in the order about that. It says remedial. It's not remedial. There's a contract reference about add-ons. There's a written add-on by Gargak here on the contract in regard to Vernon. There's nothing in the testimony that this is improper. This is not working well. Gargak's not an expert. I know you don't want to talk about expertise, Your Honor, but when it comes down to whether this building was done right, Gargak never told my client again he wanted this as a dry residential building for motorcycles to have an office in. He never told him that. He buys the cheapest building he can get. Then he upgrades with his friend Vernon, and he builds my client's home. That's the end result of this whole process. But I thought you said that it wouldn't leak if it had been manufactured correctly. The testimony trial is that these leak. There's condensation. There's moisture. Then what was wrong with the manufacturing? The overlap was bad. Then what did that cause? Well, they're also holes because what happened was, it doesn't overlap right. They put these screws in sideways to make the gaps come together. So it did cause leaking. It did cause leaking. More leaking than probably would happen with just bad metal. But because the overlaps weren't overlapping correctly, they shipped the screws in, more screws than they would typically use, and those additional screws caused some holes. He put silicone in to try to fill the holes. That didn't work either. He tried to fix the problem as best he could. But my client also uses more screws than is called for by Stratospin. He goes over and above what he should do, what's called for by the manufacturer here. He testified to that in trial as well. So now I think I understand. So the overlap was bad, so he uses more screws, although he uses more, and it was those screws that caused the holes. We believe so. Okay. Thank you, guys. Thank you, counsel. Counsel. Okay. Okay. Good morning, Your Honor. May it please the court. My name is Adam Berge. I am here on behalf of the plaintiff, counter-defendant, appellee Eugene Gargak. Today we respectfully ask this court to affirm the judgment entered into by the Honorable Judge John Barberis, Jr. on September 28, 2016, in the Third Judicial Circuit in Madison County because this judgment was not against the manifest weight of the evidence, which is the standard here before Your Honors. The defendant must prove to you today that the judgment was against the manifest weight of the evidence, and it is clearly not. There is no clearly apparent opposite conclusion that can come from this case. The longstanding Illinois law with regard to construction is that a person who contracts to perform construction work impliantly warrants that the work will be completed in a workmanlike manner. Well, that was actually in the contract. It was on the face of the contract. So what does that mean, a workmanlike manner? How has that been interpreted? A workmanlike manner is construction of quality construction that conforms to the intended use. Is that how it's defined in Illinois law, that workmanlike manner must conform to the intended use? Your Honor, I'm getting the case from Myers. They had the pool case where the case was involving a pool which the foundation crumbled and the piping broke, and they discovered that the work was not completed in a workmanlike manner. I understand, but we're talking about a defective product here, right? We are, Your Honor. Right? Correct. And so if a contractor pulls up a building and the building itself is defective, is the contractor under the workmanlike manner standard a guarantor of the manufacturer? Not of the manufacturer, but of the work, Your Honor. But in this case, we know the roof was defective. The roof was defective partially because of the metal that was milled, but partially because of the construction. If you will, I can elaborate. Yes, I want you to elaborate because construction is the issue. The testimony in this case by the defendant is amazing. On direct examination by me, he, meaning the defendant, admitted that he has built over 200 to 300 of these pole barns. He has a relationship with Stratospan. In fact, my client got his name from Stratospan. My client went to Stratospan and presented his needs for the pole barn to be a workshop. They actually suggested this model.  This is by my client. Okay, I thought we were on the testimony. Because he wants to finish the barn up, which he did. He actually did drywall. He installed electricity. He did air conditioning. He purchased a 45-year warranty roof instead of a 20-year roof, which was an additional cost. And by the way, I'd like to point out that the defendant testified that when built properly, the defendant did it on page 72 of the record. When built properly, this model does not leak. Then he admitted that this was not properly constructed. If you look outside, the roof on the building next door is tin. Not all tin roofs leak. And the presumption for people entering into a contract is not that you expect something to leak. That's not the case. So Mr. Schaefer gets to the property. There's tin and then there's steel, by the way. I think the roofs that you see on buildings like this are steel roofs that are a lot more expensive than shingled roofs. This is a metal. The case of the bar is a metal roof as well, whether it's tin or steel. I think she's speaking to your analogy next door. Never mind. Okay, that's okay. So he put the walls up, meaning Mr. Schaefer, and noticed that the back wall had a metal defect. So he informed Mr. Gargak, and Mr. Schaefer took it upon himself to take the metal off of the barn, send the metal back to Stratospan, which Stratospan gladly exchanged. He reinstalled it. Now, you heard briefly from counsel that my client was a squeaky wheel. He likes things to be done properly. The great work done for the flooring was not done correctly. They agreed on five inches of concrete for the floor because my client was going to have his trucks in there. It didn't happen, which is where the extra concrete work came from. Mr. Schaefer actually damaged his concrete himself by putting his machinery in the barn and had to fix that as well. Did the concrete work get done and completed? Yes, Your Honor. And it's being used? Yes, Your Honor. And it was for the cost of $5,227.34? That was the bill received after Mr. Schaefer had left the property. Yes, Your Honor. Okay, but is that bill, the $5,227.34, is that bill for the concrete work? It is, Your Honor. And that's the concrete that your client is using today? Yes, Your Honor. So what's the objection to payment of that? Because we felt that it was an add-on. It was remedial in the fact that Mr. Gargak and Mr. Schaefer had agreed that when they were going to pour the floor, it would be five inches thick from left wall to right wall. And in the testimony, you'll hear that Mr. Schaefer originally poured, it was going to be five inches in the middle. As they got to the end, the grade work was incorrect, which made it thinner on the edges than it was in the middle. So if Mr. Gargak was to drive his truck on the side, the concrete would crack, whereas if he was in the middle, the concrete would most likely hold. So we felt that the contract, while the concrete was necessary, it was also due to improper pouring the first time. Okay. But your client did sign off on a work order, contract, whatever, for this concrete, regardless of the circumstances. There wasn't an agreement entered into for this $5,227.34. It was performed and performed to his satisfaction and is now being used, correct? That's correct. Okay. If I may continue with the review. So tell me, if you will, how the, we know the roof leaked. We know it was not properly manufactured. Was your client informed of this in April as the roof was going up? Yes, Your Honor. Is there a text message like that? My client being informed was part of the record. Mr. Schaefer got to the job, opened the box that had all the metal, noticed it was bad, put the roof on anyway, didn't inform my client until he got home from work, at which point the roof was a quarter of the way on. A quarter of the way, but not completely on? Correct. And did your client tell him not to put it on? That specifically was not brought up, but it was implied that he did not want the metal to be put on. And here's the reason why. So what was the dispute then in the record? What is the testimony going to show? Did the two men discuss the defective roof? No, the roof was on. Was a quarter of the way on or it was on? He identified my client a quarter of the way through, but the roof was completed by the time my client got home. This is the way I believe the record reflects. Okay. I'm a little confused. Slow down. So the way you think the record is going to reveal it is your client knew about the defect a quarter of the way through? Okay. You tell me. Okay. The way I understand this is that Mr. Schaefer inspected the materials, knew they were bad, put them up because he did not want to tell the squeaky wheel client. He informed him a quarter of the way through, but my understanding is that by the time my client got back, the roof was on completely. My client noticed after rain that water was seeping through the roof. He circled in Sharpie on the floor. He circled all over the barn. He left a note on the barn. Mr. Schaefer then went up and tried to fix it, but while trying to fix it, put more holes in the roof. Now, Mr. Vernon's testimony is that he had to incur extra expense because he could not use the metal that was on the roof for a number of reasons. One, it was milled improperly. Two, there were 40 holes in the roof from Mr. Schaefer screwing and re-screwing the metal back together. And three, there were dents from them walking on the roof, which made the metal even more of an overlap-underlap problem. So he had to rip the metal off to even start over regardless. Now, Mr. Vernon's testimony, did you put the same quality of metal back onto the roof or a better quality? He put a better quality of metal on it. And what was the difference in cost between what your client originally bargained for and what was actually spent on the metal? As counsel discussed earlier, the breakdown in the proposal did not, it didn't have a line item of what was on there. And so let me ask you this. Did you get a better building than you originally bargained for? Were there additional, what are they called? Perlins. Perlins. He installed additional perlins. And those were included in the cost in labor? Yes, Your Honor. At $9,800? Yes, Your Honor. And you got better metal. That was included in the $9,880? Yes, Your Honor. And no breakdown at trial? No. Do you think that the breach of contract entitles your client to a better building than he originally bargained for? I think my client should have the roof that he originally bargained for, which was the 45-year warranty roof that does not leak. But he got a better roof. He has updated and enhanced metal. So that's my question. You agree that he should get the roof he bargained for. We know he got a better roof. So how much does the evidence show your client had to pay to get what he originally bargained for? Your Honor, we don't have the benefit of that. It's not in the record anywhere. It's not. So the court below gave your client the better bargain. I'm sorry, not the better bargain, but the better metal, the cost of the additional whatever they're called, and the additional labor for that. Yes? Yes. Okay. And I believe that was because when asked why he continued to install the roof, Mr. Schaffer replied, I just wanted to get done and completed so I could be done and gone from the project. Well, what does that have to do with contractual rights and bargains? I mean, what if your client wasn't paying in the ass? I mean, you know. He could have been, Your Honor. I don't know. I'm just saying when we construe contracts, we look at offer, acceptance, consideration, fraud or material mistake of fact, I get. But just because somebody is paying in the butt, what does that have to do with the benefit of the bargain? Why do you get a better benefit? I don't have an answer to that. Okay. I'm just asking. I'm sorry. Go ahead. But since you got the benefit of and are using the concrete floor, the floor, why wouldn't the 5,500 be a set off to the 9,800? Your Honor, that's not been discussed between the parties, truthfully. And was it raised in the trial court? It was not. Okay. Well, it was raised to the extent they filed a counterclaim. Correct. Okay. So it wasn't issued. Okay. The option of a set off was never presented at the trial. In brief closing, Your Honors, we ask this court to affirm the judgment because it is not against the manifest way of the object. Evidence, the court said, clearly defined that the deference should be given to the trial court in judging the testimony based upon witnesses and experts, and the judgment without a sitting jury should not be disrupted unless the amount given is clearly erroneous, which we feel it is not. And we respectfully ask this court to affirm the judgment and affirm the trial court in denying the counterclaim. Thank you. Thank you, Counsel. Counsel? Just briefly, Your Honors, Counsel mentioned the 40-year warranty. Gargak purchased a 40-year warranty for the materials. Why didn't he go back to Stratastan to get a 40-year warranty for the materials if they were bad? He bought the materials somewhere else. Vernon went to Missouri to get materials. He buys a 40-year warranty for the materials. Why didn't he go back to Stratastan to get the same materials replaced or free? Part of Vernon's bid is better materials, new materials. That was not explained at trial. It makes no sense to me why you buy 40-year warranty materials from Stratastan but don't use that 40-year extra benefit you buy from Stratastan. And that was objected to. It never came up. It never came up. Vernon said, I went to Missouri to buy my materials. He didn't go back to Stratastan to use the warranty he purchased. Why would he do that? But what is the judge supposed to do if there's no objection to that testimony? Well, there was no testimony, Judge. I objected to all the damaged exhibits. So there was no testimony at all about the exhibits? No, I objected to Vernon's testimony regarding damages. What I'm saying is I'm bringing up the issue now for the first time of the warranty. He brought the warranty. It was found in his argument. If Gardner had purchased a 40-year warranty for the materials, why didn't he go? And he clearly knew when this is all said and done. After he fires my guy, he definitely knows at that point the materials are bad. He didn't know before. He definitely knew when he fired my guy. Why did I go back to Stratastan and use the warranty for the materials for 40 years? He didn't do that. He hired his friend, his co-worker, Vernon, who had to get materials from somewhere else, and paid for new materials instead of using the warranty. That's part of his damages. That's what the court awarded him as part of his damages, that is, part of his unclear damages. I objected to that at trial. Yes, I did. But I'm bringing that up in court today. I didn't mention the set-up in my closing argument to Judge Barbera is that if you're going to award damages to plaintiff Gardner, you've got to award breach of contract damages. And Justice Cates, I will point out in Defensive Exhibit 7, which is in my client's contract, second barring, posts will be set in 4-inch posts, 4 inches of concrete. So the underlying contract calls for 4 inches of concrete. Gardner came in later asking for 5 inches of concrete, which is the add-on he signed off on. That's the damage exhibit that I added, which is Exhibit 8. So that's where the $5,200 comes in for my client's damages alone. And you did bring that up in the oral argument in front of the trial court. Yes, we did. We brought up the damages. Yes, sir. The set-up. The set-up, yes. I mentioned the set-up in closing. Not as evidence, but in closing. I brought up this argument. As Judge Margaret said, you're going to award damages. I think it's clear that everybody's entitled to their damages. I don't think they've proven their damages based upon their speculative exhibit. It doesn't break down. They're not entitled to a $45,000 building for a $40,000 building for $20,000. They've got more than their bargain. And keep in mind, Vernon's bills are more than Schaefer's entire project. Schaefer did the rock, the concrete, all the labor, the posts, the walls, the roof, the screwing down, everything he did. All Vernon did was tear off the materials and put on new parts and materials for the same price that Schaefer did the entire project. There was no testimony from Vernon about whether his work was done pursuant to community industry standards or whether it was reasonable or not. Yes, it was paid. We know Gargak paid his friend for the work, but we don't know that that's reasonable. My client said it wasn't. He said he could have done for half the price. He's done almost 300 of these buildings. Go ahead. Thank you, Your Honor. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case under advisement. Since we have finished the morning docket, we will reconvene at 10 after 2.